The PEOPLE of the State of Colorado, Complainant,

v.

Richard L. GARNETT, Respondent.

No. 84SA88.

Supreme Court of Colorado,
En Banc.

Sept. 29, 1986.

---

George S. Meyer, Deputy Disciplinary Pros., Linda Donnelly, Disciplinary Pros., Denver, for complainant.

Margaret Tirza Brewer, Denver, for respondent.

DUBOFSKY, Justice.

The Supreme Court Grievance Committee found that Richard L. Garnett, the respondent, had violated the Code of Professional Responsibility and the Colorado Rules Regarding Lawyer Discipline and recommended that he be suspended from the practice of law for 60 days. We approve the recommendation.

## I.

The respondent was licensed to practice law in Colorado in 1977 and is subject to the jurisdiction of this court and its grievance committee. The grievance committee found by clear and convincing evidence that on October 24, 1980, Edwin Tribble, Victoria Gibson, and Darryl Vinroe sought legal advice from the respondent about a gold mining claim near Idaho Springs that Tribble and Vinroe claimed to have staked with James Greene and Keith Lindauer. Tribble and Vinroe gave the respondent a $100 retainer and promised him one percent of the proceeds of the mine for straightening out their problems with Greene and Lindauer. After the respondent discovered from meetings with Lindauer and Greene that the claim had not been staked, he advised Tribble, Darryl Vinroe, and Dennis Vinroe that they could incorporate a mining venture, stake and file the claim, and then have the corporation, in whose name the claim was staked, file a quiet title action against all claimants to the property. The respondent prepared and filed incorporation papers for GTV Exploration, Inc. (GTV), and several days later Tribble, the Vinroes, and the respondent staked the mining claim as agents of GTV. The respondent, Tribble, and the two Vinroes each received 25 percent of GTV's stock, and the respondent filed a quiet title suit on behalf of GTV against other claimants to the property, including Tribble and the Vinroes, as individuals. After determining that he would have to be a witness in the quiet title proceeding, the respondent had another attorney sign the quiet title action pleadings, most of which the respondent had drafted. The respondent was elected secretary-treasurer of GTV, and in November 1980 GTV gave a promissory note for $10,000 to the respondent for legal services for GTV, the note to be paid when the corporation became solvent and showed a profit. Before long, the respondent was

spending most of his time putting GTV's venture together.

Charles Nunnery, whom GTV had joined as a defendant in the quiet title action, told the respondent that he would not contest GTV's claim but that he would be interested in leasing his other mining claims in the area to a company operated by Tribble, the Vinroes, and the respondent, since he could not do business with GTV because of the quiet title action. GTV accepted Nunnery's proposal and formed Rainbow Mining and Milling Company (Rainbow), a new corporation, with the respondent acting as legal counsel, serving on the board of directors, and acting as secretary-treasurer. Nunnery leased seven mining claims to Rainbow in exchange for a percentage of the Rainbow stock and the royalties from the ores mined from GTV's claims. Most of the remaining Rainbow stock was issued to GTV.

In March 1981, the respondent prepared an answer in the quiet title action to be filed pro se by Nunnery. Also in March, Tribble and the respondent had a confrontation over the respondent's comments about Tribble's former wife. When the respondent told the Vinroes he could no longer work with Tribble, the Vinroes agreed to remove Tribble from his position in GTV and Rainbow. In July, 1981, after discovering that GTV's mining claims belonged to a third party, Nunnery terminated the leases to Rainbow.

Tribble, who had missed the meeting in which the two Vinroes and the respondent considered Nunnery's termination of the leases, requested the GTV and Rainbow

corporate documents, but the respondent denied his request. When Victoria Gibson, now Tribble's wife, requested the corporate records, the respondent refused to release the files until GTV's $10,000 note was paid by GTV and stated that he was exercising an attorney's lien on the files.

The formal complaint against the respondent alleged violations of C.R.C.P. 241.6(3) (act or omission violating the highest standards of honesty, justice, or morality), C.R.C.P. 241.6(4) (act or omission constituting gross negligence if committed by a lawyer in his capacity as a lawyer), DR 5–101(A) (except with the consent of his client after full disclosure, a lawyer shall not accept employment if his professional judgment on behalf of the client will be or reasonably may be affected by his own financial, business, property, or personal interests), DR 5–101(B)[1] (a lawyer shall not accept employment in contemplated or pending litigation if it is obvious that he ought to be called as a witness), DR 7–101(A)(3) (a lawyer shall not intentionally fail to seek the lawful objectives of his client through reasonably available means), and DR 9–102(B)(4) (a lawyer shall promptly pay or deliver to client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive). The grievance committee concluded that the respondent violated DR 5–101(A), DR 5–101(B), DR 9–102(B)(4), and C.R.C.P. 241.6(3). The grievance committee dismissed the allegations that the respondent had violated DR 7–101(A)(3) and C.R.C.P. 241.6(4). The respondent filed extensive exceptions to the grievance committee's

---

1. The formal complaint does not charge the respondent with violating DR 5–101(B). Instead, the complaint mistakenly referred to DR 5–105(B) (a lawyer shall not continue multiple employment if his independent professional judgment on behalf of a client will be or is likely to be adversely affected by his representation of another client or would be likely to involve him in representing differing interests unless it is obvious that he can adequately represent the interests of each and each consents to the representation after full disclosure). We have held previously that consideration of charges not in the formal complaint violates procedural due process of law, *People v. Eme-*

*son*, 638 P.2d 293 (Colo.1981), but the proper focus in determining whether a violation occurred is on whether a respondent has notice of the charges against him before he testifies or presents evidence. *In re Ruffalo*, 390 U.S. 544, 549–51, 88 S.Ct. 1222, 1225–26, 20 L.Ed.2d 117 (1967). In this case the respondent had sufficient notice that he was charged with violation of DR 5–101(B) because the prosecutor noted in his opening statement that respondent had violated DR 5–101(B) and that serving as counsel in a case in which he would be a witness was a conflict of interest. The grievance committee made no findings concerning a violation of DR 5–105(B).

findings of fact, and this court remanded the case to the grievance committee for more explicit findings.

After the grievance committee submitted its second set of findings, the respondent again filed exceptions to the findings of fact, asserting that many of the findings were not supported by any evidence or were directly contrary to the weight of the evidence. The respondent urges this court to dismiss the case against him because his clients suffered no harm and because he did not have an interest in his clients' dispute. In addition the respondent notes that there was testimony that he spent extensive time advising his clients about conflicts of interest, and that, while he prepared the pleadings in the quiet title proceeding, another attorney controlled the litigation. Finally, the respondent claims that he was not obligated to turn over the records because he had an attorney's lien based on GTV's note, and that, as secretary to the corporation, he had a duty to prevent Tribble from taking the documents and fraudulently raising money on invalid mining claims.

## II.

■ The grievance committee's factual findings are binding upon this court unless, after considering the record as a whole, we conclude that the findings are clearly erroneous and unsupported by substantial evidence. *People v. Gibbons,* 685 P.2d 168, 172–73 (Colo.1984).

2. In his opening brief the respondent argues that he did not accept a proprietary interest in the Vinroes' and Tribble's dispute with Greene and Lindauer when he accepted an undefined one percent interest in the mine because the offer and acceptance were never reduced to writing to meet the requirements of the statute of frauds. § 38–10–108, 16A C.R.S. (1982). According to the respondent's testimony he was given a one percent interest in proceeds of the claim, not in the claim itself. It is unclear whether a contract for a share in the proceeds of a mine must meet the requirements of the statute of frauds. *See Kayser v. Mongham,* 8 Colo. 232, 6 P. 803 (1885) (sale of mine proceeds does not escape application of statute of frauds through a creation of a trust); 37 C.J.S. *Frauds,*

### A.

■ The record adequately supports the grievance committee's finding that the respondent failed to advise Tribble and GTV concerning the effect of the respondent's financial interest on his ability to represent GTV and Tribble. DR 5–101(A) prohibits a lawyer from accepting employment if his professional judgment will be or reasonably may be affected by his own financial, business, property, or personal interests unless he has the consent of his clients after full disclosure. In this case the record contains substantial evidence that the respondent accepted employment in the quiet title litigation after he had been promised a one percent interest in the proceeds of the mine[2] and after Tribble and the two Vinroes had agreed to give him 25 percent of the stock in GTV, which in turn bought 60 percent of the stock of Rainbow. Despite these financial interests, the respondent filed and represented GTV in a quiet title action from which he believed he could make an enormous profit and in which he eventually became a third party defendant,[3] while the Vinroes and Tribble, against whom Greene and Lindauer filed cross claims, were sued as individuals and could not afford to hire attorneys.

The record also contains substantial evidence that the respondent did not fully disclose to Tribble or GTV the effect of his financial interest on his ability to represent them. The fact that the record contains some evidence of discussions between the Vinroes and the respondent concerning the effect of the respondent being a sharehold-

*Statute of* § 83(b) (1943) (compensation for services with minerals taken out of ground does not affect an interest in land). However, even though the respondent may not have acquired an interest in the Vinroes' and Tribble's claim, the respondent does not deny owning 25 percent of GTV's stock or a financial interest, as a third-party defendant, in the outcome of the quiet title litigation.

3. Greene and Lindauer alleged in a third party complaint that the respondent willfully and maliciously interfered with the original agreement involving the Vinroes, Tribble, Greene and Lindauer and sought $150,000 in damages.

er and an officer in a corporation for which he was handling litigation and the effect of his being a third-party defendant in the quiet title litigation on the exercise of his professional judgment does not undermine the grievance committee's finding that the respondent failed to discuss fully the effect that his financial interest in GTV might have upon his ability to represent GTV or the effect that his liability in the quiet title action might have on his representation of Tribble as an individual. The respondent's failure to fully advise his clients of potential conflicts with his financial interests violated DR 5–101(A).

### B.

■ The respondent asserts that he did not accept employment in contemplated litigation when it was obvious he ought to be called as a witness in violation of DR 5–101(B) because he did not control the litigation and therefore was not employed in that litigation. While another attorney signed GTV's pleadings, the respondent admitted that he prepared 95 to 99 percent of the documents. In addition, the respondent admitted that he prepared an answer in the quiet title litigation for Nunnery to file pro se, and the attorney who signed the pleadings stated that the respondent prepared answers for Tribble and the two Vinroes to file pro se. The findings of the grievance committee that the respondent prepared most of GTV's pleadings and rendered legal advice to Tribble, the Vinroes, and Nunnery are supported by substantial evidence in the record. The respondent effectively controlled numerous aspects of the quiet title litigation and, to the extent that he did not control the litigation, preparing 95 to 99 percent of the pleadings constitutes continuing the representation. Lawyers may not skirt the application of DR 5–102(B) by having other attorneys sign the pleadings. *See Razatos,* 636 P.2d 666 (attorney-client relation can be based on implied contract and conduct of parties) *appeal dismissed,* 455 U.S. 930, 102 S.Ct. 1415, 71 L.Ed.2d 639 (1982). *Conway-Bogue Realty Investment Co. v. Denver Bar Association,* 135 Colo. 398, 312 P.2d 998

(1957) (drafting legal instruments and advising concerning the legal effect is the practice of law).

It was obvious that the respondent ought to be called as a witness in the quiet title litigation both on behalf of GTV, which was filing the claim, and on behalf of himself as a third-party defendant. The respondent therefore could continue representation of GTV only if his testimony would relate solely to an uncontested matter, a matter of formality, or the nature or value of legal services or if refusal to accept employment would work a substantial hardship on the clients because of the distinctive value of the lawyer in the particular case. DR 5–101(B). In this case the first three exceptions do not apply because the respondent's testimony would have concerned his part in the formation of GTV and overstaking the claim.

DR 5–101(B)(4), which allows a lawyer to accept employment in a case in which it is obvious that he will be a witness if refusal of employment "would work a substantial hardship on the client because of the distinctive value of the lawyer," enables an attorney who has had a long or extensive professional relationship with a client to continue employment with the client and be a witness if the attorney's testimony is not overly adverse to the client. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 339 (1975). While the respondent's testimony concerning the overstaking might not have been adverse to GTV, his testimony on behalf of himself concerning whether he interfered with the economic relations between Lindauer, Greene, the Vinroes, and Tribble may well have been adverse to GTV. In addition, at the point when the respondent accepted employment with GTV his relatively short-term professional relationship with the Vinroes and Tribble did not mean that his services were of distinctive value to GTV. The fact that he helped form GTV and helped to stake the claim only makes it obvious that he would be called as a witness. Finally, the respondent drafted pro se answers for Nunnery, the Vinroes, and

Tribble as individuals while knowing that his testimony concerning GTV's overstaking would be adverse to their interests in the mine as individuals.

■ The respondent asserts that he was obligated to draft the pro se answers because the Vinroes and Tribble could not afford to hire another attorney, but such a justification does not meet DR 5–101(B)(4)'s requirement that refusal to accept employment would work a substantial hardship on the client because of the distinctive value of the lawyer when the respondent was involved in filing the very quiet title action on behalf of GTV that he knew or should have known would require the Vinroes and Tribble to hire attorneys. DR 5–101(B)(4) did not provide a basis for respondent's continued employment by GTV, Nunnery, the Vinroes, and Tribble in the quiet title litigation.

The respondent's preparation of most of the pleadings for GTV, preparation of pro se pleadings for Tribble, the Vinroes and Nunnery, and provision of legal advice to Tribble and the Vinroes when it was obvious that the respondent ought to be called as a witness in the quiet title action violated DR 5–101(B).

## C.

The respondent maintains that his refusal to provide Tribble with the corporate records did not violate DR 9–102(B)(4), which requires that an attorney deliver to a client property in the possession of the attorney that the client is entitled to receive. The respondent contends that he was asserting a valid attorney's lien and was attempting to prevent Tribble from committing fraud by using the corporate records to obtain additional funding for mining ventures. The grievance committee found that the $10,000 note on which the respondent claimed an attorney's lien could not be the basis of a valid lien because the note was to be paid when the corporation

was solvent and no one suggested that the corporation was solvent. The committee also found that the respondent was required as secretary of the corporation to make the books available to GTV's shareholders and officers including Tribble,[4] and that despite the respondent's allegation that Tribble was attempting to commit fraud, the respondent would have made copies of the corporate records available if Tribble had paid the $10,000.

■ In order for an attorney to assert a retaining lien, the client must owe the attorney a general balance of compensation. *People ex rel. Goldberg v. Gordon,* 199 Colo. 296, 607 P.2d 995 (1980); § 12–5–120, 5 C.R.S. (1985). In this case there is a significant question whether GTV owed the respondent any compensation because the respondent had already received one percent of the proceeds of the mine and 25 percent of the stock of GTV.

The promissory note states that GTV is obligated to the respondent for $10,000 "[f]or and in consideration for the rendering of legal services." Because it is unclear whether these legal services occurred prior to execution of the note or were to occur after execution of the note, and therefore when and whether the note was payable, the grievance committee properly heard parol evidence concerning the underlying obligation in order to determine if a lien attached. *See Kelley v. Carson,* 120 Ga.App. 450, 171 S.E.2d 150 (1969); *Engelcke v. Stoehsler,* 273 Or. 937, 544 P.2d 582 (1975); F. Hart & W. Willier, *Commercial Paper and the Uniform Commercial Code* § 12.15[2] (1986).

■ The testimony concerning the underlying obligation indicated that the note was not payable until GTV became profitable. While the respondent correctly asserts that when a promissory note is payable, as a convenience, on a future event that does not occur, the note is payable

---

**4.** Although the respondent testified that Tribble was de facto removed as president and Darryl Vinroe testified that Tribble was asked to leave the corporation, Dennis Vinroe stated that Trib-

ble was never removed because no vote was taken. Tribble may also have had access to the corporate books and records as a shareholder. *See* § 7–5–117, 3 C.R.S. (1985).

within a reasonable time, 10 C.J.S., *Bills & Notes* § 245 (1938), the note in this case was not merely payable on a future event as a convenience but was not payable at all unless that event occurred. Although Darryl Vinroe's testimony was unclear about whether the note would be payable if the corporation did not have the funds, Dennis Vinroe testified that the note was to be paid when the mine prospered. The respondent admitted that he never expected the corporation to pay his bill, probably because he believed his stock in GTV or his one percent ownership of the proceeds of the claim to be extremely valuable until he discovered GTV had overstaked someone else's claim. The respondent stipulated that the note would be paid only when the corporation became solvent and showed a profit. The grievance committee correctly concluded that because GTV was not solvent the promissory note could not be the basis for a lien.

 The committee's finding that the respondent was required as secretary of the corporation to make the books available to GTV's shareholders was also correct. The respondent admitted that Tribble was a GTV shareholder. Corporate resolutions of both GTV and Rainbow instructed the respondent to make the bylaws available to shareholders for inspection at all reasonable times at their request.

Finally, the respondent's testimony supports the grievance committee's finding that the respondent would have made the papers available to Tribble if he had been paid $10,000, despite the fact that he thought Tribble would attempt to use the papers to commit fraud. The grievance committee concluded that the respondent's desire to prevent fraud was not the reason that he failed to make the corporate records available to Tribble. The respondent's refusal to allow Tribble access to the records violated DR 9–102(B)(4).

### III.

In accepting employment in a case affected by his own financial interests without the consent of his clients after full disclosure, continuing employment in a case when it was obvious that he ought to be called as a witness, and refusing to turn over corporate files to an officer and shareholder in the corporation, the respondent violated C.R.C.P. 241.6(3), which prohibits acts or omissions by lawyers that violate the highest standards of honesty, justice, or morality. We approve the grievance committee recommendation that the respondent be suspended for a period of 60 days and that he be required to pay the costs related to this proceeding.

Accordingly, it is ordered that the respondent be suspended from the practice of law for a period of 60 days. The respondent is ordered to pay costs of $1692.37 to the Supreme Court Grievance Committee within thirty days from the date of the announcement of this opinion. The respondent's reinstatement is conditioned upon full compliance with C.R.C.P. 241.22(b) and full payment of costs.