The PEOPLE of the State of
Colorado, Complainant

v.

Michael A. WALKER, Respondent.

No. 05PDJ039.

Office of the Presiding Disciplinary Judge
of the Supreme Court of Colorado.

Dec. 27, 2005.

## OPINION AND ORDER IMPOSING SANCTIONS

### I. *ISSUE*

 Suspension is generally appropriate when a lawyer causes injury by: (1) failing to act diligently; (2) improperly attempting to influence witness testimony; or (3) offering a false document in court proceedings. Respondent took fees from clients then failed to meaningfully communicate with or diligently represent them. Respondent also pressured a former client to recant a valid disciplinary complaint and offered a false document in these proceedings. Is suspension appropriate absent evidence of mitigating factors?

**SANCTION IMPOSED: ATTORNEY SUSPENDED FOR SIX MONTHS WITH THE CONDITION THAT RESPONDENT BE REQUIRED TO FILE A PETITION FOR REINSTATEMENT PURSUANT TO C.R.C.P. 251.29(b).**

### II. *PROCEDURAL HISTORY AND BACKGROUND*

On April 21, 2005, OARC filed a complaint in case number 05PDJ039 ("Complaint"). Respondent filed his answer *pro se* on May 12, 2005. On October 17–19, 2005, the Hearing Board heard evidence regarding the substantive allegations set forth in the OARC's Complaint. The Hearing Board also allowed the Parties to present evidence of aggravating and mitigating factors, and make arguments on the appropriate sanction for the rule violations. OARC initially recommended a three-month stayed suspension, but reserved the right to ask for a greater suspension if Respondent's defense raised issues of his lack of honesty and candor in the proceedings. Following Respondent's testimony and his offer of an exhibit that Respondent had not provided in the normal course of discovery, the OARC recommended a six-month suspension with the requirement that Respondent petition for reinstatement. OARC presented four witnesses including an expert in immigration law. Respondent and his wife, the office manager of his law firm, testified on his behalf.

### III. *FINDINGS OF MATERIAL FACT*

The Hearing Board considered the testimony of witnesses and exhibits admitted into evidence, and now makes the following findings of material fact by clear and convincing evidence.

Respondent took and subscribed the Oath of Admission and gained admission to the Bar of the Colorado Supreme Court on October. 14, 1994. He is registered upon the official records of the Colorado Supreme Court, attorney registration number 24830. Respondent is therefore subject to the jurisdiction of this Court in these disciplinary proceedings pursuant to C.R.C.P. 251.1(b).

Respondent maintains a high volume immigration law practice. He asserted that his practice is exclusively limited to the federal courts and that he also represents clients engaged in international business.

**The Ulloa Matter**

On July 18, 2001, Nancy Henry, a resident of Douglas, Wyoming, met with Respondent for two hours at his office in Denver for the purpose of retaining him to represent Roberto Ulloa ("Ulloa").[1] Ulloa, detained in feder-

---

1. Ms. Henry met Ulloa in 1985 and they later lived together in a common law marriage. INS

al custody at the time of this initial meeting, faced imminent deportation to Mexico upon the completion of a 42–month sentence following a conviction for illegal reentry after a final order of removal. The INS scheduled Ulloa's deportation to Mexico for December 2002.

At this initial meeting, Ms. Henry told Respondent that she and Ulloa wanted to challenge Ulloa's impending deportation. Before his original deportation, Ulloa, a permanent alien, maintained a ranch in Wyoming for 16 years while he lived with Ms. Henry and helped raise her children. In explaining Ulloa's legal plight, Ms. Henry provided Respondent with extensive documentation from other lawyers who previously represented Ulloa. These documents chronicled the events that led to Ulloa's most recent incarceration and impending deportation.[2] Nevertheless, Respondent claims that it took him months to obtain the documents on Ulloa's legal history from Ms. Henry and to realize the complexity of Ulloa's case.

The documents Ms. Henry provided Respondent on July 18, 2001, included a *pro se* petition citing 212(c) of the Immigration and Naturalization Act ("INA"). Ulloa's previous counsel prepared this petition for Ulloa's signature. Although previous counsel appealed and lost Ulloa's original attempt to avoid deportation following his conviction in Wyoming state court, a remote possibility still existed that Ulloa could qualify for a waiver of removal under a 212(c) petition based upon a recent United States Supreme Court opinion, *Immigration and Naturalization Service v. St. Cyr*, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).[3]

After meeting with Ms. Henry, Respondent agreed to represent Ulloa and prepared a written fee agreement, which designated Ms. Henry as an "authorized agent" on behalf of Ulloa.[4] Respondent also asked for and received a $500.00 retainer from Ms. Henry at this meeting. Thereafter, Respondent billed Ms. Henry, not Ulloa, at a rate of $150.00 per hour. At some point after July 2001, Respondent asked for and received an additional $1,000.00 in fees from Ms. Henry. The only face-to-face meeting between Respondent and Ms. Henry took place on July 18, 2001. Respondent never met face-to-face with Ulloa, although Respondent's billing records show that he called Ulloa on December 13, 2001 and spoke to him for thirty minutes.

After Ms. Henry retained Respondent, he billed her for various services including research, teleconferencing, and *drafting legal documents*. For drafting legal documents alone, Respondent billed Ms. Henry a total of $1,350.00. Although Ms. Henry repeatedly asked to see the legal documents Respondent drafted, he never provided them to her. In the weeks leading up to December 17, 2002, Ms. Henry, in a panic, repeatedly called Re-

deported Ulloa in 1996 following a state felony conviction in Wyoming.

**2.** The following events led to Ulloa's conviction for illegal reentry. In November 1994, Ulloa was convicted of a felony in Wyoming state court for "delivering a controlled substance." In January 1998, he was deported (removed) to Mexico after unsuccessfully challenging his deportation as well as attempting to withdraw his guilty plea in Wyoming. Approximately one year later, Ulloa illegally reentered the United States to again live with Ms. Henry, was arrested, and convicted of illegal reentry following deportation and sentenced to 42 months in a federal facility.

In 1996 Congress passed two laws that limited the rights of resident aliens to appeal an adverse ruling from the BIA under section 212(c) of the Immigration and Nationality Act. These laws are the Antiterrorism and Effective Death Penalty Act (AEDPA) and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).

Based upon the applicable case law at the time Ulloa pled guilty to a delivery of a controlled substance in Wyoming, it would have been extremely difficult for Ulloa to collaterally attack his prior order of removal on the merits. Ulloa had been deported for delivery of a controlled substance. See *U.S. v. Mendoza–Lopez*, 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987).

**3.** *St. Cyr* held that permanent resident aliens like Ulloa were not deprived of habeas corpus relief to challenge a final order of removal nor did stricter laws dealing with alien's rights to appeal a final order of removal (the AEDPA and IIRIRA pasted by Congress in 1996) deny a qualifying alien the right to request discretionary relief from deportation under 212(c) of the Immigration and Nationalization Act.

**4.** In this written fee agreement, Respondent affirmed that he would provide "high quality legal counsel and perform legal services for Client, faithfully and with due diligence."

spondent asking him to do something before the federal facility released Ulloa from federal prison and INS deported him again.

On December 17, 2002, the day before Ulloa completed his federal sentence for illegal reentry and faced imminent deportation, Respondent filed a motion on Ulloa's behalf and cited the *St Cyr* case. However, instead of filing the pleading with the Board of Immigration Appeals, as previous counsel directed the petition, Respondent filed the motion in the Immigration Court, a court that lacked jurisdiction to hear the motion. Before filing this pleading, Respondent did little or nothing to analyze the facts in Ulloa's case and advise his client or Ms. Henry of a legal strategy. This pleading was virtually the same document prepared by previous counsel and supplied to Respondent by Ms. Henry in July 2001.

The Immigration Court dismissed Respondent's *St. Cyr* motion for lack of jurisdiction and Respondent took no remedial action including filing the motion before the BIA. Shortly thereafter, the INS deported Ulloa back to Mexico. Respondent explained to the Hearing Board that he filed his *St. Cyr* pleading in the Immigration Court as a matter of strategy to stop Ulloa's deportation. Respondent also claims that after Respondent conferred with Ulloa, Ulloa decided to abandon any appeal and return to Mexico. Given the fact that Ulloa would have remained in federal custody during the appeal, Respondent's version of these events may very well be true, but there is nothing in Respondent's file to support or refute the claim that Ulloa abandoned his effort to remain in the United States.

Throughout the seventeen months Respondent represented Ulloa, Respondent assured Ms. Henry he was working on the case. In spite of these assurances, there are no documents in Respondent's file that demonstrate that he analyzed the facts, contacted lawyers who previously represented Ulloa, personally met with Ulloa to develop a viable legal strategy, or advise Ulloa that an appeal would be expensive and the likelihood of success would be slim. Months into the representation, Respondent admittedly did not know the facts of the case and blamed Ms. Henry for not giving him the information he needed to represent Ulloa.

On April 10, 2003, shortly before Ms. Henry terminated Respondent and nearly two years after being retained, Respondent sent Ms. Henry a letter stating that he had spent considerable time reviewing Ulloa's records and consulting with several people about Ulloa's legal situation. Respondent stated that unless Ms. Henry could provide evidence of Ulloa's "positive equities," there would be no point in further pursuing Ulloa's case. Respondent further stated that if he did not hear from Ms. Henry he would terminate his representation of Ulloa.

Before receiving Respondent's letter, Ms. Henry had grown weary of Respondent's claims that he was working on the case and on April 11, 2003, four months after Ulloa's removal to Mexico, she documented her concerns in a letter to Respondent. She demanded that Respondent send her "a copy of all documents that you have submitted on behalf of Roberto Ulloa." Respondent failed to provide any documents because he had no documents to provide.

On April 15, 2003, Respondent sent Ms. Henry a "Notice of Intent to Terminate and Notice of Attorney Lien" with a request for prompt payment of $525.00. On September 19, 2003, Respondent's office administrator sent Ms. Henry a second letter and requested payment of the delinquent account with a notice of termination of the case unless they received payment by October 15, 2003.

On December 26, 2003, Ms. Henry sent a letter to Respondent and terminated his representation. On March 30, 2004, without explanation, Respondent billed Ms Henry an additional $1,000.00 and claimed a retaining lien on Ulloa's file. On or about January 15, 2004, Ms. Henry filed a complaint with OARC.

When OARC asked Respondent in its initial investigation to provide all documents filed on behalf of Ulloa, Respondent produced a one-page document citing *St. Cyr*, an appeal fee waiver request form, two pieces of paper with handwritten notes, and an entry of appearance on behalf of Ulloa in the Immigration Court. On the day of this hearing,

however, Respondent presented a memorandum, Exhibit LL, and claimed that it represented the legal writing and research he performed throughout his representation of Ulloa. The Hearing Board has grave doubts that Respondent drafted and revised this document throughout the course of his representation of Ulloa, as he now claims. This explanation is dubious given Respondent's failure to provide OARC with this document in discovery, or to Ms. Henry after she made numerous requests for any documents to support his billing for research and drafting.

## The Daouda Matter

On October 13, 2001, Toure Daouda ("Daouda") met with Respondent for the purpose of obtaining counsel to contest his impending removal from the United States. Daouda is originally from Cote ï Ivoire, formerly known as the Ivory Coast, Africa. On September 26, 2001, Daouda was arrested at Denver International Airport while attempting to secure an identification badge he needed for employment at the airport. After his arrest at the airport, Daouda admitted to authorities that he did not have proper documentation to live and work in the United States. On September 26, 2001, immigration agents issued Daouda a notice to appear to answer charges concerning his presence in the United States without proper documentation.

After Daouda explained these circumstances, Respondent agreed to represent him. Daouda's first language is French and although he can speak English without difficulty, his English reading and writing skills are less developed. Both Respondent and Daouda signed a written fee agreement and Daouda paid Respondent a retainer of $490.00 and agreed to pay for Respondent's services at the rate of $150.00 an hour.[5]

On December 5, 2001, Respondent filed an entry of appearance on behalf of Daouda in the Immigration Court. On or about December 18, 2001, after filing a Freedom of Information Act request to the Immigration and Naturalization Service, Respondent received Daouda's criminal record.

On April 13, 2002, Respondent filed a request for "Cancellation of Removal" relief in the Immigration Court. In doing so, Respondent understood that he would have the burden of proving the following as Daouda's counsel:

- Daouda's physical presence for a continuous period of not less than 10 years in the United States;
- Daouda's good moral character; and
- Exceptional and extremely unusual hardship, not to Daouda, but to his U.S. citizen or lawful permanent resident spouse, parent, or child.

In seeking cancellation of removal, Respondent filed a standard form, form EOIR–42B, with the Immigration Court. This form contained 17 errors or omissions. Daouda pointed out these errors to Respondent's staff when Daouda reviewed the document in Respondent's office. Nevertheless, Respondent presented this document to the Immigration Court without correction. Both parties agree that it is crucial in these cases to gather the facts, in addition to the information provided by form EOIR–42B, to support a *prime facie* case for cancellation of removal.

On September 16, 2002, three months before the cancellation of removal hearing in the Immigration Court, Respondent wrote to Daouda and reminded him that he had not yet provided Respondent with "any legal documents" to provide the Immigration Court in support of Daouda's case. One of the items Respondent specifically asked for included documentation to explain the entries on Daouda's criminal record. Daouda's FBI record contained references to "terroristic threats, theft by deception, forgery, wrongful impersonation, and filing false statement," all entries that, without further explanation, would adversely affect Daouda's case.

Daouda tried to provide all the information Respondent requested, but had trouble obtaining specific information. When Daouda ran into difficulties obtaining these records, Daouda asked for Respondent's help. Re-

---

5. In this written fee agreement, Respondent affirmed that he would provide "high quality legal counsel and perform legal services for Client, faithfully and with due diligence."

spondent did not assist Daouda but instead claimed that it was up to Daouda to obtain these records. If Respondent had gathered the information, it would have been at Respondent's personal expense because Daouda's retainer would not have covered these costs. Yet Respondent never asked Daouda for additional funds so he could help Daouda obtain these records.

On December 2, 2002, Respondent sent Daouda a second letter and advised Daouda of his intent to terminate his services unless Daouda paid him an additional $1,000.00 by December 9, 2002. Respondent, however, did not withdraw from the case, nor did he obtain the records necessary to prove Daouda's case for cancellation of removal. Instead, when Daouda paid Respondent $500.00 before the hearing, Respondent continued to represent Daouda and proceeded to the hearing without the documentation or witnesses necessary to prove Daouda's case. In addition, Respondent presented the testimony of Daouda, without meeting with him and preparing him to testify.

Predictably, the Immigration Court found that Respondent failed to prove the grounds for cancellation of removal and ordered Daouda deported. In its oral findings, the Immigration Court found a "complete lack of evidence" concerning the three elements that would allow the Immigration Court to cancel the removal order. The Immigration Court further stated that it would have been fairly simple to obtain much of the missing documentation. OARC presented an expert witness who supported the Immigration Court's finding that the missing documentation would have been relatively simple to obtain and further offered that she would customarily obtain this information in her practice.

When Respondent left the Immigration Court, Daouda felt upset about the outcome, but Respondent assured Daouda that despite the Immigration Court's order of deporta-

tion, Daouda would be able to remain in the United States. Later that day, December 11, 2002, Respondent sent Daouda a letter and stated, "[i]n my opinion, the weakness in the Judge's ruling is his apparent over-reliance on *small mistakes* on birth certificates and legal documents and the FBI report." (emphasis added) In the same letter, Respondent advised Daouda that he would take the appeal at a cost between $3,000.00 and $6,000.00, as long as Daouda gave Respondent $1,500.00 before January 5, 2003. On January 7, 2003, apparently upon receipt of additional funds from Daouda, Respondent filed a Notice of Appeal with the BIA of the Immigration Judge's Order denying Daouda's request for cancellation of the removal order.

Shortly after Respondent filed a notice of appeal of the Immigration Judge's order, Daouda retained another immigration lawyer who filed an appeal asking that Daouda's cancellation of removal proceedings in the Immigration Court be reopened because Respondent had been "ineffective" in representing Daouda.

On May 20, 2003, the BIA affirmed the Immigration Court's order denying Daouda's request for cancellation of removal. On July 15, 2004, Respondent appealed the BIA's decision to the Tenth Circuit Court of Appeals. The following day, July 16, 2004, the Tenth Circuit Court of Appeals denied Respondent's appeal and affirmed the BIA's decision to deport Daouda.[6]

On or about September 14, 2004, Daouda filed a formal complaint against Respondent with OARC. On October 1, 2004, Respondent requested more time to respond to Daouda's complaint. OARC agreed to this request.

On October 5, 2004, the BIA issued an opinion denying Daouda's request to reopen his cancellation of removal proceedings based on ineffective assistance of counsel.[7] The

---

**6.** The Hearing Board notes that Respondent included documents in his exhibit books supporting the actions he took after the Immigration Court ruled against Daouda's request for cancellation of removal. He did not, however, offer them into evidence. Nevertheless, the Hearing Board considered these documents since they showed that Respondent appealed Dauoda's case

to the BIA and the Tenth Circuit, conduct that was favorable to his case.

**7.** In *Matter of Lozada*, 19 I & N Dec. 637(BIA), *rev.den.*, 857 F.2d 10 (1st Cir.1988), held that an alien who wishes to attack a denial of cancellation of removal must establish, among other proof, that a complaint has been filed with ap-

BIA held that Daouda had not been prejudiced by his counsel's performance. In their opinion, the BIA found the result would not have been any different given Dauoda's failure to present a *prime facie* case for cancellation of removal.

Even though the BIA denied Daouda's request to reopen his cancellation of removal hearing, the BIA agreed with the Immigration Judge who heard the case and stated, "that the respondent (Daouda) *and his counsel were lax* by not presenting those items (documentation needed to prove a *prime facie* case) at the hearing."

On October 20, 2004, Respondent wrote a letter to OARC requesting additional time "to receive material legal documents." Respondent requested this and the earlier continuances so that he could have time to convince Daouda to withdraw his complaint against Respondent pending before OARC.

On October 24, 2004, Respondent met with Daouda who was detained at a federal facility in Aurora, Colorado. At the time, other counsel may still have represented Daouda on his pending removal/deportation, but Daouda did not discuss this point with Respondent. The next day, after meeting with Daouda, Respondent wrote a letter to Daouda, which purportedly memorialized the conversation Respondent had with Daouda the day before. Respondent wrote:

> [a]fter discussing you (sic) case at length, you stated to me that the affidavit was not true that the allegations against me were not true. You stated to me that you understood that I did the best job I could representing you and in reality effectively represented you. You agreed to sign a statement to this effect and withdraw the complaint against me with the Colorado state regulators.

Respondent also provided a draft letter for Daouda's signature "correcting the record." This draft letter stated that Daouda's counsel "made up false allegations against Mr. Walker." It ended with a request that the "complaint-grievance against Michael A. Walker"

propriate disciplinary authorities with respect to any violation of counsel's ethical or legal respon-

be dismissed. Daouda refused to sign the draft letter because it did not represent what he believed to be true.

On October 28, 2004, Respondent returned to the federal facility and again asked to speak with Daouda. This time Respondent brought along Charles Obeng, a gentleman from Africa, who also tried to convince Daouda to withdraw his complaint against Respondent. Respondent again wrote a letter to "memorialize" the conversation that completely exculpated Respondent and accused Daouda's lawyer of misconduct by falsely accusing Respondent. Daouda again refused to sign the letter Respondent prepared for his signature. At no time during these post-representation meetings did Respondent advise Daouda of the potential conflict of interests between himself and Daouda, nor did Respondent advise Daouda to seek counsel concerning Respondent's advice to drop the complaint. Finally, Respondent did not inquire whether Daouda was still represented by counsel.

## IV. CONCLUSIONS OF LAW—
## SUBSTANTIVE ALLEGATIONS

### The Ulloa Matter

The Hearing Board finds clear and convincing evidence that:

1. Respondent violated Colo. RPC 1.3 when he failed to pursue a legal matter diligently. Respondent's inaction shows neglect in pursuing his client's interests. *See People v. Barber,* 799 P.2d 936, 940 (Colo.1990).

2. Respondent violated Colo. RPC 1.1 when he failed to provide competent representation. While Respondent appears to possess the skills to competently represent immigration clients, he failed to use those skills to timely analyze the factual and legal elements of his client's legal problems, and failed to use methods and procedures to meet the standards of a competent practitioner.

sibilities, and if not, why not.

3. Respondent violated Colo. RPC 1.4(a) when he failed to reasonably inform his client about the status of his legal matter and when he failed to promptly comply with reasonable requests for information. As stated above, Respondent agreed to represent Ulloa, but failed to answer Ms. Henry's numerous oral and written requests for copies of legal research and legal documents after he billed her for the same. Respondent also failed to inform Ulloa how costly and legally difficult it would be to prevail on Ulloa's challenge to deportation on appeal.

4. Respondent violated Colo. RPC 1.5(a) when he charged an unreasonable fee and Colo. RPC 8.4(c) when he billed for work he did not complete. While Respondent claims his billing records show that he "more than earned" the $1,500.00 he received from Ms. Henry, his own records, *or lack of records,* show that he did not research and draft documents as he claimed. In this context, the fee Respondent charged was both unreasonable and dishonest.

5. Finally, Respondent violated Colo. RPC 1.16(d) when he failed to return the file to the client or client's authorized agent, Ms. Henry. Based upon the findings above, Respondent could not in good faith claim a lien on the file. See *People v. Garnett,* 725 P.2d 1149, 1154 (Colo.1986).

### The Daouda Matter

The Hearing Board finds clear and convincing evidence that:

1. Respondent violated Colo. RPC 1.3 when he failed to diligently represent Daouda. As the record shows, Respondent did not prepare for Daouda's cancellation of removal hearing. Instead, Respondent washed his hands of any responsibility for gathering the documents necessary to meet his burden. This evidence also supports a finding that Respondent violated Colo. RPC 1.1 when he failed to provide competent representation to Daouda.

2. Respondent violated Colo. RPC 1.4(b) when he failed to communicate with Daouda to the extent reasonably necessary to permit Daouda to make informed decisions regarding the representation.

### The OARC Matter

1. The Hearing Board does not find clear and convincing evidence that Respondent violated C.R.C.P. 251.5(d) by obstructing OARC in the performance of its duties. And although Colo. RPC 1.8(h) and RPC 8.4(a), when read together, prohibit a lawyer from attempting to settle malpractice liability with a former client without first advising that person in writing that independent representation is appropriate, there is no evidence that Respondent approached Daouda in an attempt to settle a malpractice suit.

2. Nevertheless, the Hearing Board finds by clear and convincing evidence Respondent violated Colo. RPC 8.4(d) when he engaged in conduct prejudicial to the administration of justice. Here, Respondent's conduct came dangerously close to tampering with a witness. See C.R.S. § 18–8–707, which states that it is a crime to intentionally attempt to induce a witness to unlawfully withhold testimony. *See also In re Myers,* 981 P.2d 143, 144 (Colo. 1999).

## V. SANCTIONS

The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law are the guiding authorities for selecting and imposing sanctions for lawyer misconduct. The appropriate sanction depends upon the facts and circumstances of each case.

### Analysis Under the ABA *Standards*

Suspension is generally appropriate when a lawyer fails to perform services for a client, or engages in communication with an individual in the legal system when the law-

yer knows, or reasonably should be aware that the communication is improper and causes potential injury in either case. ABA *Standards* 4.42 and 6.32, respectively. Therefore, suspension is the presumptive sanction for Respondent's misconduct. However, in imposing a sanction after a finding of lawyer misconduct, ABA *Standard* 3.0 directs the Hearing Board to first consider the following factors:

(1) the duty violated;

(2) the lawyer's mental state;

(3) the actual or potential injury caused by the misconduct; and

(4) the existence of aggravating or mitigating factors.

## A. THE DUTY VIOLATED

Respondent violated duties to his clients, the legal system, and the legal profession by failing to diligently pursue his client's interests and effectively communicate with them. "Attorney misconduct perpetuates the public's misperception of the legal profession and breaches the public and professional trust." *In re DeRose*, 55 P.3d 126, 131 (Colo.2002) (paraphrasing *In re Pautler*, 47 P.3d 1175, 1178 (Colo.2002)).

## B. THE LAWYER'S MENTAL STATE

Respondent was aware of his conduct when he failed to communicate with his clients, attempted to persuade Daouda to withdraw his complaint against Respondent, and when he presented Exhibit LL for the Hearing Board's consideration. While the Hearing Board finds Respondent was aware of his conduct and therefore acted knowingly, remarkably he does not appear to comprehend the harm he caused his clients and the legal profession. While the Hearing Board finds Respon-

dent acted with awareness, whether Respondent acted with intent is a much closer question. After due consideration of this issue, the Hearing Board finds insufficient evidence to prove by clear and convincing evidence that Respondent acted with *intent* in these matters.[8]

## C. THE ACTUAL OR POTENTIAL INJURY

Even if Respondent had communicated with and competently represented these clients, they may well have been deported based upon existing case law. But this does not answer the issue of *potential* injury to them or our system of justice when Respondent failed to act professionally. It is not just the result but also the process that matters here.

## D. AGGRAVATING AND MITIGATING FACTORS

### 1. MATTERS IN AGGRAVATION, ABA *STANDARD* 9.2

The Hearing Board considered evidence of the following aggravating circumstances in deciding what sanction to impose.

**Prior Disciplinary Offense—9.22(a)**

On November 19, 1998, the Colorado Supreme Court Grievance Committee privately admonished Respondent for failing to make full disclosure to a state court in a mandatory injunction hearing regarding the insurance coverage of a client and found Respondent violated the highest standards of honesty and engaged in conduct prejudicial to the administration of justice, both issues before this Hearing Board in the current case.

**Selfish Motive–9.22(b)**

Board could not find by clear and convincing evidence that Respondent acted with intent to deceive, although this was a close question. In addition the Hearing Board finds that Respondent's presentation of Exhibit LL did not potentially cause a significantly adverse effect on these proceedings in that the document was so obviously a recent draft, that there was no potential for the introduction of the document to have an adverse affect on the proceedings.

---

8. Although the issue of a "false document" is not before the Hearing Board as matter of substance in the Complaint, the Hearing Board referred to ABA *Standards* 6.11 and 6.12 for guidance on the issue of aggravation in its analysis. Under ABA *Standards* 6.11, disbarment would generally be the appropriate sanction for a lawyer who intentionally tries to deceive a court by presenting a false document if such presentation causes or potentially causes a "significantly adverse effect on the legal proceeding." Here the Hearing

Respondent is correct that a private practitioner need not be responsible for the costs of litigation. Indeed the practice of law is a business as he claims. But it is also a profession and Respondent, in the Hearing Board's view, seemed not to understand the proper balance between meeting his professional duties and running a business. *See People v. Roehl,* 655 P.2d 1381, 1381–83 (Colo.1983). Furthermore, Respondent could have legitimately requested to withdraw from Daouda's case based upon RCP 1.16(b)(1). Instead, he collected more money from his client and did nothing to advance a good faith claim of cancellation of departure/deportation.

**Pattern of Misconduct/Multiple Offenses—9.22(c) & (d)**

The Hearing Board finds Respondent engaged in a pattern of misconduct in the Ulloa and Daouda cases. In each case, his clients continued to ask him to provide meaningful services. When they did, Respondent ignored them but continued to request more money while doing little to earn it or advance the client's interest.

**Submission of False Evidence or Statements—9.22(f)**

Respondent's tender of Exhibit LL the day before trial raises serious questions about Respondent's credibility and candor with the Hearing Board in these proceedings.

**Refusal to Acknowledge Wrongful Nature of Conduct—9.22(g)**

Respondent steadfastly refuses to acknowledge that he has done *anything* wrong. Instead of accepting responsibility, he placed the blame on his clients for his failure to communicate and develop a meaningful strategy to defend them. Further, he claims that without lawyers like him who are able to offer reduced fees, aliens like Ulloa and Daouda would not be able to obtain affordable counsel.

**Vulnerability of the Victim—9.22(h)**

Respondent's clients were particularly vulnerable. They were in the United States without proper documentation and had to depend entirely on Respondent to counsel them to understand their rights and plan a legal strategy. Further, Respondent used and attempted to use this vulnerability to his advantage, especially when attempting to convince Daouda that he should abandon his OARC complaint.

**Substantial Experience in the Practice of Law—9.22(i)**

Respondent has practiced law for over 10 years.

**2. MATTERS IN MITIGATION, ABA STANDARD 9.3**

Respondent presented no evidence of mitigation nor did he demonstrate the same in his cross-examination of the People's witnesses and exhibits.

### Analysis Under Case Law and ABA Standards

Colorado Supreme Court case law applying ABA *Standards* 4.42 and 6.32 hold suspension is the presumptive sanction when a lawyer causes potential injury by knowingly failing to perform services for a client or when a lawyer engages in an improper communication with an individual in the legal process. *People v. Barber,* 799 P.2d 936 (Colo.1990) (citing ABA *Standard* 4.42 the Colorado Supreme Court suspended lawyer for 6 months for missing the statute of limitations claiming he had a better plan but failed to adequately communicate it to his clients). *But See People v. Yaklich,* 744 P.2d 504 (Colo.1987) (one year suspension for neglect of custody support matter and failure to carry out client's objectives).

Under Supreme Court law and the *ABA Standards* 6.12 suspension is also appropriate when a lawyer knows that a false document or statement is being submitted to the court and this causes or potentially causes an adverse affect on the proceedings. *But see People v. Hertz,* 638 P.2d 794 (Colo.1982)(the Supreme Court publicly censured for improperly attempting to influence a complainant in the grievance process.)

Addressing issues of the duty violated, Respondent's mental state, potential injury caused, aggravating factors and the lack of

mitigating factors, the Hearing Board concludes, a suspension for a period of six months is warranted with the added condition that Respondent must petition for reinstatement and demonstrate rehabilitation by clear and convincing evidence.

## VI. CONCLUSION

One of the primary goals of our disciplinary system is to protect the public from lawyers who potentially pose a danger to them. Here, there is no question that Respondent's clients presented difficult practical and legal issues for him. His clients may very well have expected too much of him and were "difficult clients" as he testified. However, Respondent did not have to take their cases or continue to represent them if they failed to abide by the terms of his fee agreement by failing to pay him or failing to cooperate with him. Having failed to timely withdraw, Respondent had a duty to act professionally on behalf of these clients.

The Hearing Board would have been inclined to recommend a suspension of three-months, without the condition of applying for reinstatement, had Respondent not offered Exhibit LL as evidence of his diligence. This tender raised serious issues of Respondent's candor and integrity and provided a significant aggravating factor in the Hearing Board's decision. As such, the Hearing Board finds that an appropriate sanction for Respondent should include a demonstration of rehabilitation before he is once again licensed as a lawyer in the State of Colorado.

## VII. ORDER

It is therefore ORDERED:

1. MICHAEL A. WALKER, attorney registration number 24830, is **SUSPENDED** from the practice of law in the State of Colorado for a period of **SIX MONTHS**, effective thirty-one (31) days from the date of this Order.

2. MICHAEL A. WALKER **SHALL** be required to petition for reinstatement and demonstrate under C.R.C.P. 251.29(b) clear and convincing evidence of his rehabilitation.

3. MICHAEL A. WALKER **SHALL** pay the costs of these proceedings. The People shall submit a Statement of Costs within fifteen (15) days from the date of this Order. Respondent shall have ten (10) days thereafter to submit a response.

4. MICHAEL A. WALKER **SHALL** be required to attend and pass OARC's Ethics Course.

5. MICHAEL A. WALKER **SHALL** refund to Ms. Henry the sum of $1,350.00, the amount he billed her for researching and drafting legal documents.